# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### January 23, 2008 Session

## STATE OF TENNESSEE v. MARTHA ANN FREEMAN AND RAFAEL DEJESUS ROCHA-PEREZ

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2005-C-2044   J. Randall Wyatt, Jr., Judge**

**No. M2006-02751-CCA-R3-CD** - Filed March 28, 2008

A Davidson County jury convicted the Defendants, Martha Ann Freeman and Rafael DeJesus Rocha-Perez, of the first-degree murder of Martha Freeman's husband. On appeal, Freeman alleges that the trial court erred by: (1) admitting a nude photograph of Rocha-Perez; (2) refusing to allow Freeman to play a recording of a 911 call; and (3) refusing to grant her motion to sever. Rocha-Perez alleges the trial court erred by allowing a police officer to testify concerning a statement Freeman made in violation of the Confrontation Clause. Both Defendants allege there was insufficient evidence to support their convictions. After a thorough review of the record and applicable law, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which DAVID H. WELLES and THOMAS T. WOODALL, JJ., joined.

Richard McGee and Glenn Funk, Nashville, Tennessee, for the Appellant, Martha Ann Freeman. Peter J. Strianse and Ana Escobar, Nashville, Tennessee for the Appellant, Rafael DeJesus Rocha-Perez.

Robert E. Cooper, Jr., Attorney General and Reporter; Michael E. Moore, Solicitor General; Benjamin A. Ball, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; Katrin Miller and J.W. Hupp, Assistant District Attorneys General, for the Appellee, State of Tennessee.

## OPINION
### I.  Facts
### A. Pre-trial Motions

The Defendants were indicted on charges of first-degree premeditated murder of Freeman's

husband, Jeffrey Freeman.[1]  Prior to trial, the trial court heard testimony concerning a motion to allow Freeman to introduce the tape of a 911 call and a motion to sever the Defendants' trials.  At that hearing, Raegene Beverly testified that she lived across the street from the Freemans in 2005. On the afternoon of April 11, 2005, she heard pounding at her front door.  Beverly opened her front door, and Freeman entered her house.  Without looking Beverly in the eye, Freeman stated "A man killed my husband."  Beverly asked if she had called 911, to which Freeman responded, "No." Beverly turned, picked up her cell phone, and dialed 911.  While Beverly talked to the operator, Freeman "just st[ood] there."  The operator asked Beverly a few questions until Beverly handed the phone to Freeman.  Freeman did not respond to the operator's questions, so Beverly then took back the phone.

In describing Freeman's demeanor, Beverly stated that she was "somewhat stern" and was not crying; Beverly never gave Freeman any tissues.  Freeman simply sat down on Beverly's interior steps.  Relaying answers through Beverly, Freeman stated she knew the man who killed her husband and that her husband had "found him."  Beverly told the operator that Freeman did not know if the man was still inside her house.

On cross-examination, Beverly stated she had not been in the Freemans' house very often. She described them as friendly neighbors, and they would often talk in the yard.  Beverly also testified that some weeks prior to the hearing she called Freeman's attorney to check on Freeman's mental health out of "concern[] for her welfare."

Karen Neal testified that she also lived across the street from the Freemans.  Neal stated that she was up at 7:45 a.m. on the morning of April 11, 2005.  As she was preparing for work, she saw Freeman, who appeared to be alone, standing on her front porch with a cigarette in her hand.  Neal testified that Freeman was "very still" and "rather unusual," and Neal was concerned that she might need help.

On cross-examination, Neal stated that she would not have noticed if someone was looking out the door or window at Freeman.  She did not know her observations were important until she discussed it with another neighbor, who suggested she call the police.  On redirect-examination, Neal clarified that Freeman was not "in distress or a panic or crying" but "emotionless" and "zoned out."

Lori Estridge, a Walgreens pharmacist, testified that she was a custodian of records at Walgreens.  Estridge stated that a technician filled a prescription for Freeman on April 10, 2005, at 10:01 p.m. under her supervision.  Estridge initialed the sale.  Estridge further described some of the medications Freeman had filled at Walgreens and the effects they may have on a person.

Tara Cantrell testified she was employed at the Freemans' company, Resi-Fax, for three years.  Although Freeman was not at the business day-to-day, the victim was.  He usually came into

---

[1]Jeffrey Freeman, the victim, will be referred to as "the victim."  Martha Ann Freeman will be referred to as "Freeman."

work around 8:00 a.m. and was there when Cantrell left at 5:00 p.m. Cantrell testified that she received a phone call from Freeman between 8:00 and 8:30 a.m. on the morning of April 11, 2005. Freeman told her that the victim would not be at work that day due to illness. Freeman was not upset or crying, and she sounded "normal."

In a subsequent hearing on the motion, Beverly was recalled and questioned. Beverly testified that Freeman could be described as "shaking," "panicking," and "scared" when she first entered Beverly's house. On cross-examination, Beverly stated that she saw nothing to indicate that Freeman had been held hostage. From Freeman's actions, it appeared to Beverly that the incident had just taken place.

By written order, the trial court found that the recording of the 911 call should not be admitted at trial as it was hearsay not falling under any exception, specifically the excited utterance exception. *See* Tenn. R. Evid. 803(2). Elaborating on that finding, the court stated that "the actions by the Defendant Freeman, coupled with the substantial time interval between the victim's death and the 911 call, do not support the notion that her statements were spontaneous and logically sprung from the stress of her husband's murder." The trial court next found that the defendants should not have their trials severed because Freeman has not shown "compelling prejudice," and the Defendants' defenses are not "irreconcilable." Additionally, Freeman made no showing that Rocha-Perez would testify for her if their trials were severed. In a separate written order, the trial court also denied Rocha-Perez's motion for severance for similar reasons.

## B. Trial

At the trial on the charges of murder, the following evidence was presented: Raegene Beverly testified that she was the Freemans' neighbor and had been since 2000. She and her husband lived across the street from the Freemans, and she would, on occasion, take care of the Freemans' dog and hamsters. Beverly stated that she also worked for Martha Freeman at her home performing computer input for her business. In 2003 or 2004, the Freemans' business, Resi-Fax, had grown large enough to move from the Freemans' home to a location in Brentwood. At that point, the victim left his job to run Resi-Fax full time.

Beverly testified that, in September of 2004, she noticed that Freeman's car was no longer at the Freemans' house. For some months she did not see Freeman, until Superbowl Sunday in January 2005. Beverly stated she last saw the victim in their yard on April 9, 2005, standing with Freeman. Beverly did not notice anything peculiar about the way they were acting.

The following Monday, April 11, 2005, Beverly opened her front door to Freeman, who was "pounding" on it. Freeman entered Beverly's house and said something to Beverly, which prompted Beverly to call 911. Beverly spoke to the 911 operator for a period of time, and then she gave the phone to Freeman. Freeman then gave the phone back to Beverly who continued to speak to the operator. A short time later, emergency vehicles arrived at the scene. Beverly stated she never saw anyone run from the Freemans' house during this period of time.

3

On cross-examination by Freeman's attorney, Beverly testified that she and Freeman were friends, but they did not socialize on a weekly basis. Beverly recalled that Freeman's mother, Margaret Cockrill, moved in with the Freemans after Beverly quit working there. Freeman cared for Cockrill until her death. Beverly stated that when she saw Freeman on Superbowl Sunday she offered to begin taking walks with Freeman. That did not occur, however, and she did not see Freeman much more. Beverly did state that two weeks after the Superbowl, Freeman explained to her that she was on medication. Beverly further testified that Freeman was "shaking" when she entered the house on April 11, 2005. Beverly assumed she was scared. Freeman acted as if she was "panicking" and "anxious," and it appeared as if she was "in shock."

On cross-examination by Rocha-Perez's attorney, Beverly stated she came to know Tara and Anthony Cantrell through Freeman's business. Anthony Cantrell would perform odd jobs at the Freeman residence. Beverly testified that she did not see Anthony Cantrell in or around the Freemans' residence the weekend of April 10 and 11, 2005.

On redirect-examination, Beverly described Freeman's behavior further. She stated that she never saw Freeman cry, so she never offered her a Kleenex. Freeman's behavior "calmed down" after the initial moments.

Brian Hampton, a firefighter, testified that he and his company were called to respond to the Freemans' residence in response to a "potential[ly] expired person." When they arrived, Freeman exited from a house across the street. She "appeared to be crying and hysterical and she did make it known that she was a resident in the house." Hampton began questioning Freeman about basic information. He asked Freeman when the incident occurred and "she nodded yes" or "what [he] consider to be a yes" to "twenty to thirty minutes."

In describing further Freeman's state, Hampton said she was "excited," "agitated," "crying," "flailing about with her hands and that sort of thing." "She appeared to be upset and was in a highly excitable state." An hour later, she was "calm." When Hampton entered the house, he, along with medical personnel, discovered the victim's body. The victim had water dripping off his body, but "lividity had set up." The victim "appeared to have been there for a long time." Rigor had already begun, "which takes a certain number of hours to occur." Hampton described the body as lying in a sleeping bag, partially zipped. There was a plastic bag over the victim's head, and the bag was "tied or taped." Hampton did not notice any blood, and he determined that the vicitm was dead and not going to be revived.

Karen Kirby testified that, on April 11, 2005, around 3:30 or 3:45 p.m., she saw a Hispanic man run through her neighborhood. He was running from a wooded area into a house under construction. Kirby described the man as having shoulder-length hair, wearing shorts to his knees and a maroon tee-shirt., and in court she identified this man as Rocha-Perez. Immediately after she saw him run into the house, she saw police cars driving up Incline Drive, the street where the Freemans live. Later, Kirby told the police what she saw.

4

Sergeant Danny Collins, with the Metropolitan Police Department, testified that he was directed to Incline Drive to begin his investigation. Collins stated that Kirby's husband flagged him down with information about a Hispanic man who had run into a house. On information from Kirby, Collins and another officer entered a residence on Palomar Court at approximately 6:20 p.m., and they encountered two individuals. These individuals were apparently examining the house and building procedures, and they told the officers they heard something upstairs. The officers began clearing the house and ultimately found Rocha-Perez in the attic rafters.

Officer Joseph High testified that he was the first police officer to arrive at the Freeman residence on April 11, 2005. He waited for other officers to arrive, and, when they did, they searched the residence. They discovered the victim, who had no signs of life, on the master bathroom floor in a sleeping bag.

Officer High also explained how he responded to a house on Palomar Court with Sergeant Collins and Officer Hinkle. Sergeant Collins and Officer Hinkle went inside the residence to clear it while Officer High remained at the back door to prevent anyone from escaping. Within minutes, Officer High heard Sergeant Collins and Officer Hinkle yelling in Spanish and English to "show your hands." Officer High ran up to where the others were and aided in arresting the suspect by handcuffing, searching, and placing him in the patrol car.

Tony Cantrell testified that he was friends with Mr. and Mrs. Freeman, and he worked for Freeman, cleaning the house and running her errands. He stated he also knew Rocha-Perez, but Tony Cantrell indicated that Rocha-Perez's hair was shorter than he remembered. Cantrell testified that in December 2004 Freeman requested he come to the Candlewood Suites in Brentwood to pick-up Rocha-Perez. She asked Cantrell to take Rocha-Perez to Murfreesboro and provided him a map. Cantrell never discussed this trip with the victim.

Cantrell further testified that on Thursday, April 7, 2005, he was working at the Freeman residence resealing their back deck. He was unable to finish the job because of rain, so he left the house. He did not return until Monday, April 11, 2005. When he arrived, an officer asked that Cantrell take him to where Rocha-Perez lived in Murfreesboro, which he did.

On cross-examination by Rocha-Perez's attorney, Cantrell testified that he met Freeman in 2001 when he was performing odd jobs for a neighbor, Ms. Neal. Cantrell stated that, at that time, he was working for a wrecker service and cleaning residences on the side. Cantrell cleaned Freeman's windows, painted the windows, and cleaned the garage. Cantrell also described his inability to finish restaining the deck on April 7, and he stated that he told Freeman and the victim that he would return Monday, April 11, to finish the job. Eventually, Cantrell learned about Freeman's home business and that she needed some help. Cantrell suggested his wife, Tara Cantrell, and Freeman hired her.

Tony Cantrell further testified that in 2001-2002, he also helped Freeman by "babysitting" her elderly mother when the Freemans went out of town. Cantrell stated he did not know if Freeman

5

ever checked his background, but he admitted in court to a conviction of possession with the intent to distribute more than five grams of cocaine in 1996. Cantrell testified that Freeman remained at the extended-stay hotel for about six months. She sometimes requested that he run errands for her while she was at the hotel, including taking her to the ATM. Cantrell stated that it was his impression that the relationship between Freeman and Rocha-Perez was coming to an end when she called for him to retrieve Rocha-Perez. When he arrived to get Rocha-Perez, Freeman had packed up all of his belongings, and Cantrell left for Murfreesboro. Freeman instructed him to stop at an ATM and take from her account $100.00 for Rocha-Perez. Cantrell stated that he was closer friends with Freeman than the victim, and he never disclosed to the victim that Freeman was staying at an extended-stay hotel with Rocha-Perez.

On re-direct examination, Cantrell testified that he was not aware that a relationship between Freeman and Rocha-Perez had restarted after he took Rocha-Perez to Murfreesboro. Cantrell further explained that he planned on completing the deck-staining job on Monday, April 11, after his other job let out at 2:30 p.m. On cross-examination by Freeman's attorney, Cantrell testified that he did not kill Jeffery Freeman.

David Bixby, the manager at the Candlewood Suites, testified that Freeman checked-in on October 12, 2004, and checked-out on January 29, 2005. Bixby stated that Rocha-Perez stayed in the room with Freeman, and on one occasion he saw the victim, Jeffrey Freeman. The victim came by the hotel and asked to speak with Freeman. Bixby witnessed them meet and talk in the lobby.

Scotty Dodd, the housekeeping supervisor at Candlewood Suites, testified that he knew of Freeman and her fellow guest, Rocha-Perez. Dodd stated that Rocha-Perez was present every time he serviced Freeman's room. On cross-examination by Rocha-Perez's attorney, Dodd stated that Freeman was "overly friendly" and, as such, he kept his distance from her. Dodd felt uncomfortable around Freeman.

Detective Joseph Winter testified that he was assigned the task of determining to which apartment Cantrell took Rocha-Perez, and he located Rocha-Perez's apartment. On cross-examination by Freeman's attorney, Detective Winter testified that when he arrived at the Freeman residence Freeman was there. She left with Detective Corcoran to give a statement at the Police Headquarters. She then returned and assisted with the investigation. After they finished on the night of April 11, Freeman apparently decided not to stay at the residence.

Detective David Achord testified that he executed a search warrant of the Murfreesboro apartment on April 22, 2005. He found a bag at the residence, inside which was Freeman's business card. On cross-examination by Freeman's attorney, Detective Achord stated that he also searched Freeman's computers for evidence, including e-mails. Among the e-mails found between Freeman and the victim, a number contained the name "Snookums." One was dated September 7, 2004, and one January 20, 2005. Detective Achord further testified that he performed a walk-through of the residence. He stated that the victim's car was found parked in the garage with the garage door closed; Freeman's car was found parked in the driveway. He also found some trash bags in the

6

residence, one of which contained a wet bath mat. No trash bags were found in the victim's car. Detective Achord also discovered an empty prescription bottle in the residence for hydrocodone, issued on April 10, 2005, but he found no loose pills in the house. He did, however, note a shotgun in a separate bedroom, but he stated that they found no shotgun shells in the residence.

Detective Achord testified that, subsequent to the initial investigation, he accompanied Freeman to the police precinct where Freeman voluntarily answered questions. Afterwards, Detective Achord requested she return to the house to walk them through it. She voluntarily agreed to do so, and the walk-through was tape-recorded. In addressing the Murfressboro search, Detective Achord stated that they encountered a woman named Beatrice Ruiz. Ruiz spoke "passable English" until Detective Achord attempted to explain the search warrant process; Ruiz then seemed to have trouble understanding.

Dr. Thomas Deering, an Assistant Medical Examiner with Metro Nashville, testified that he performed an autopsy on Jeffery Freeman on April 12, 2005. Dr. Deering examined the 5'7", 231 pound victim and found scrapes on the victim's head, blanching of the skin around the neck, ligature marks around the wrists, a "black-eye," and bruising and scrapes inside the mouth. The victim also had "multiple hemorrhages in his scalp," blunt trauma to the head, and bruises on the front of the left shoulder and left chest. Based on these injuries, Dr. Deering testified that he determined the cause of death to be strangulation, either from a ligature or hands. The injuries to the head and face were not sufficient to cause death, but they may have caused him to lose consciousness. Although it would only take a matter of seconds for a person to lose consciousness by strangulation, it would take "several minutes" to kill someone. Dr. Deering testified that, although the victim was found in wet clothes, there was nothing specific to say he was drowned, and it was theoretically possible. Any blood present would have likely come from the victim's "busted lip."

Dr. Deering next identified photographs taken at the autopsy, specifically of the ligature marks and bruising on the neck and wrists. Dr. Deering identified bruising and blanch marks for the jury. Significantly, Dr. Deering stated that the ligature marks on the wrists happened before death. Bruising around the wrists means that the victim was bound while he was alive and he struggled against the ties on his wrists. Additionally, there were scrapes around the wrists indicating resistance against the bonds. Dr. Deering stated that the bruising around the eye was severe enough to require "moderate" force or a "pretty good hit."

In attempting to estimate the time of death, Dr. Deering explained that he could not precisely pinpoint the time. He did say, however, that when the victim was found, lividity had set in, and he had a large blanch mark on his abdomen from lying face down. This indicated the victim had been dead for a "number of hours" when he was found at 4:00 p.m. on April 11, 2005. Deering estimated that the victim died "anywhere from the evening of 4/10 to early in the morning on 4/11 . . . plus or minus probably several hours." When pressed for a more specific time, Dr. Deering stated that 10:00 p.m. on April 10 to 2:00 a.m. on April ll was the "best" he could do. The victim was definitely dead for at least eight hours before he was found, "maybe ten, maybe twelve." Dr. Deering testified that a spot on the sleeping bag in which the victim was found could be blood, as well as a spot near the

shoulder of the tee-shirt the victim was wearing.

On cross-examination by Freeman's attorney, Dr. Deering testified that the time of death was a rough estimate, and it was possible that the victim died any time between 6:00 p.m. on April 10 and 8:00 a.m. on April 11. Dr. Deering estimated that the victim received four to seven blows to the head. The blow to the eye required moderate force and could have been accomplished with a fist. The orbital bones were not broken around the eye. The nose abrasion was also consistent with being hit with a fist, as was the blow to the top of the head and the one to the forehead. Any one of these injuries could have caused the victim to lose consciousness.

The ligature marks around the neck could have been caused by a number of things, including hands or shirt being pulled up around the neck. In theory, one could stop breathing, and the heart would continue to beat for a few minutes. Dr. Deering agreed that a number of scenarios posed by counsel could explain these injuries. First, the victim could have been hit, stunned, bound, and then strangled. Second, it was also possible that the injuries to the head could have been caused after death. Third, the victim could have been held under water by the neck. Dr. Deering testified, however, that while the third scenario was theoretically possible, it was not as plausible because the wrist marks indicate the victim was still alive, and one who wishes to drown someone would likely wait until the heart stops or beats so slowly as to be ineffective. Dr. Deering stated "countless" other scenarios could also explain the facts. The doctor was unable to determine how many attackers were involved in the killing.

On cross-examination by Rocha-Perez's attorney, Dr. Deering testified that the time of death was an estimate based mostly on the pictures taken at the scene. The bag found on the victim's head could have caused the marks on his neck and could have played a role in the victim's death. The marks on the wrists were non-specific in that Dr. Deering could not specifically say what type of object was used to tie up the victim. Dr. Deering agreed that a person could hang himself with mild force.

On redirect-examination, Dr. Deering testified that the "butt end" of a shotgun could also be used to inflict the victim's injuries. Additionally, a pillowcase or some other covering placed over the victim might prevent tearing of the skin when hit.

John Hollands[2], a Nashville attorney who handles divorce cases, testified that he met with the victim on December 29, 2004, to discuss legal rights associated with divorce. Hollands gave the victim some initial advice, but the victim never returned.

Lori Estridge, the Pharmacy Manager at Walgreens on Edmondson Pike in Nashville, testified that she was in charge of records at that particular Walgreens. Estridge testified that, based on records, Freeman purchased a prescription on April 10, 2005, at 10:01 p.m. On cross-examination by Freeman's attorney, Estridge testified that the prescription was for hydrocodone.

---

[2]It appears that the witness was actually John Hollins of Hollins, Wagster, Weatherly and Rabin.

8

Estridge described the medications that Freeman purchased at Walgreens beginning in January, 2005, until April 10, 2005: Allegra, an antihistamine; Alprazolam, used to treat anxiety, and side effects include drowsiness particularly when taken with anti-depressants or pain killers; Lexapro, used to treat depression; Lipitor, used to treat cholesterol; Ambien, a sleep inducer; Adacan, used to lower blood pressure; Gabapentin, used to treat seizures; Hydrocodone, a pain killer with a side effect of drowsiness; birth control patches; Temazepam, used as insomnia therapy; Effexor, an anti-depressant; and Nitrolpurantin, an antibiotic.

On redirect-examination, Estridge testified that Freeman's only listed condition was hypertension, and there were no medications on the list that would treat bi-polar disorder or schizophrenia. On recross-examination, Estridge testified that most of the medications were prescribed by Dr. Nyquist, a psychiatrist. Estridge noted that the hydrocodone prescription was not prescribed by Dr. Nyquist.

Officer George Bouton testified that he investigated the crime scene and photographed the house. Officer Bouton noted that there was no evidence of a forced entry, and he described a number of photographs he took that were shown to the jury. Noted were trash bags in various locations, a shotgun, and an English/Spanish electronic translator.

Tara Cantrell testified that she is married to Anthony ("Tony") Cantrell, and they have three children. She met the Freemans through her husband and then worked for Freeman at their house on Incline Drive beginning in September 2002. The business, Resi-Fax, outgrew the residence and moved to an office in Brentwood approximately one year later. Once the business moved to the Brentwood location, the victim began running the company. The victim usually came to work at 8:00 to 8:30 a.m., and he left work at 6:00 or 7:00 p.m. every night. He did not call in sick, and he occasionally worked on weekends.

Cantrell testified that she was working the morning of April 11, 2005, when she received a call from Freeman at around 8:30 or 9:00 a.m. She told Cantrell that the victim was "ill and would not be in that day." Cantrell only later learned that the victim was dead. Cantrell testified that she knew the Freemans were having marital problems, and Freeman told Cantrell that she had moved out of the house. Cantrell stated that the victim always wore his wedding band.

Cantrell further testified that her husband was at a motorcycle meet in St. Louis the weekend of April 9-10, 2005. He returned home Sunday night, April 10, at 11:00 p.m. Cantrell identified a business card of Freeman's that the police discovered at the apartment in Murfreesboro. She stated that the handwritten phone number on the card was Freeman's cell phone.

On cross-examination by Freeman's attorney, Cantrell acknowledged that Freeman's participation in the business diminished from 2003 until 2005. Cantrell testified that she noticed "severe ups and downs" in Freeman's behavior in 2004, and Cantrell acknowledged picking-up a prescription for Freeman on one occasion. Cantrell also testified that, after the victim's death, the business closed because of his death and "some other things, as well."

9

On cross-examination by Rocha-Perez's attorney, Cantrell testified that, at some point, she became aware that Freeman moved out of the house and into a hotel. Cantrell knew that her husband had been to the hotel, and he reported to Cantrell that a Hispanic man was there with Freeman. Cantrell further testified about the motorcycle trip her husband took. He began washing the Freemans' deck on Thursday, April 7, 2005, and he left for St. Louis on Friday, April 8, 2005. He returned on Sunday night, April 10, 2005, at 11:00 p.m. Cantrell admitted, however, that she was not with her husband during this time.

Cantrell stated that, after the victim's death, Freeman asked her to pick-up medication and bring it to the house. Later, Freeman requested that she come to the house and clean up the bathroom, which she did the weekend of April 16-17, 2005.

Karen Neal, Freeman's neighbor, testified that she walked by one of her windows at 7:45 a.m. on April 11, 2005, and noticed Freeman standing on her front porch with a cigarette in her hand. Freeman was not smoking, and she stood motionless. Neal described Freeman as looking "odd" and as if "there might possibly be something wrong." Neal noticed no one else around Freeman. On cross-examination by Freeman's attorney, Neal stated that she watched Freeman for approximately thirty seconds, and Freeman "appeared to be staring down."

Hazel Freeman, the victim's mother, testified that her son would usually call her once a week, usually on Sunday night around midnight eastern standard time (11:00 p.m. central standard time). The night of April 10, she received a phone call from Freeman who explained to her that the victim was "ill." Freeman told her that she gave the victim medication, and he had gone to bed. Hazel Freeman did not detect anything out of the ordinary in Defendant Freeman's voice when they spoke.

Next, by stipulation, the State read into evidence a stipulation that stated: "it is stipulated that Martha Freeman signed two (2) business documents on June 24, 2005, and July 7, 2005, acknowledging that Jeffrey Freeman died on April 10, 2005. The signed stipulation, giving no further details, was admitted into evidence.

Officer William Kirby, with the identification unit, testified that he was assigned to 5424 Incline Drive on April 11, 2005, to process evidence. He showed the jury the bag found around the victim's head, and he stated that he found the victim wet and lying on the tiled bathroom floor. Officer Kirby also discovered a white plastic trash bag in the kitchen pantry with a silver ring inside. On the kitchen floor was a black plastic trash bag containing a telephone cord and latex gloves. Officer Kirby found in the upstairs hallway another black plastic trash bag with a white plastic trash bag inside; inside of that bag he found a wet bath mat and a wet pillowcase that appeared bloody. The pillowcase matched one from the master bedroom. Officer Kirby also found a paper sack containing six Playboy, Penthouse, and Maxim magazines. Stretched out in the foyer they found a beach towel. A long-sleeved gray tee-shirt and a mattress were found in the closet of an upstairs bedroom ("Bedroom 2"). Also in Bedroom 2, Officer Kirby testified that they found a plastic Tiger Market cup, two Dr. Pepper cans, one Coke can, and one Maxim DVD. In a third bedroom ("Bedroom 3") he found a shotgun. In discussing fingerprints, Officer Kirby processed the gun and

soda can for latent fingerprints, but none were discovered.

On cross-examination by Freeman's attorney, Officer Kirby testified that he arrived at the scene at 4:15 p.m. and left between 8:00 and 10:00 p.m. Officer Kirby stated that the shotgun was found empty, and no shells were discovered in the house. He returned to the house on Friday, April 15, 2005, with another identification officer and Detective Corcoran. There, they collected clothes on the floor of Bedroom 3 and additional items from the closet in Bedroom 2. They also collected vacuumings and checked for additional latent fingerprints. Officer Kirby was told that all of this was done with the consent of Freeman.

On cross-examination by Rocha-Perez's attorney, Officer Kirby testified that, as far as he knew, the police did not "secure" the scene between April 11 and April 15. Officer Kirby stated that he examined the shotgun for latent prints but none were found – not even partial prints. Additionally, he stated that he did not process the black plastic bag from the victim's head, the trash bag boxes, or a small TV-radio. He was not asked to process the doorknob or doorhandle on the front door and storm door. He also did not process the security system control pad or the backdoor for fingerprints.

On redirect-examination, Officer Kirby explained that he only processed the soda can and shotgun for fingerprints. Many times, crime scenes do not contain fingerprints for various reasons. On recross-examination by Freeman's attorney, Officer Kirby testified that they removed twenty-two items from the house on April 11 and 15. When he returned on April 15, the house did not look as if it had been altered in any way. Officer Kirby admitted, though, that he was not at the house between April 11 and 15.

Officer Steve Stone, an identification officer, testified that smooth, slick surfaces retain fingerprints better than porous surfaces. Officer Stone attempted to obtain fingerprints from a number of objects in the house and testified about those. He was unable to lift prints from two banquet TV dinner boxes, a Hispanic Maxim magazine, one Playboy magazine, a GQ magazine, a TV guide, three and one half loaves of bread, digital clock and radio, two TV remote controls, and a purple Game Boy. Officer Stone was able to obtain "lifts" from a paper plate on the bedside table, a plastic Tiger Mart cup, a Penthouse magazine, another Playboy magazine, a Diet Coke can, and a Maxim DVD and DVD cover. Officer Stone testified that it was difficult to obtain fingerprints from doorknobs as a general rule. On cross-examination by Rocha-Perez's attorney, Officer Stone stated that he was not asked to process any of the plastic trash bags or the trash bag boxes found at the scene.

Linda Wilson, a fingerprint examiner at the Metropolitan Police Department, testified that she identified Rocha-Perez's fingerprints on a Playboy magazine, Penthouse magazine, and a Dr. Pepper can. Additional fingerprints found at the scene were also matched to Freeman. Wilson concluded that no prints she examined came from someone other than Freeman or Rocha-Perez. On cross-examination by Rocha-Perez's attorney, Wilson stated that she was not given to analyze any of the plastic bags found at the scene, including the one found on the victim's head. She also was

11

not given to analyze the victim's wallet or a pair of latex gloves. Many of the prints lifted by the officers lacked sufficient detail to make an identification.

Detective Brad Corcoran, the lead detective on this case, testified that he arrived on the scene at 4:15 p.m. on the afternoon of April 11, 2005. Detective Corcoran described Freeman as "cooperative," and she allowed the police to search the home. When he first met Freeman she was "upset," but that "subsided quickly." Freeman then became "very matter of fact" and assisted in the investigation. Detective Corcoran described the scene and noted that the victim was found in a sleeping bag with a plastic bag around his head. He was still clothed, but his body was wet. Lividity and rigor mortis had set in on the victim. Detective Corcoran discovered a small amount of blood around the victim's collar but none anywhere else on his body. He found blood on a pillowcase inside of a trash bag. Detective Corcoran stated that "[i]t appeared to be the evidence that was going to be thrown away after a cleanup."

Detective Corcoran testified that he did not request the trash bag found on the victim's head be checked for prints because the bag was wet, and wet things are not conducive to chemical powders. For the same reason, he did not request that the officers check the trash bags for prints. He also decided not to test the victim's wallet because there did not appear to be a robbery. Detective Corcoran also searched a bag found at the scene that contained "lingerie, panties, bustia', and . . . sexual type books." The bag also contained a hotel receipt from the Renaissance Hotel and a Polaroid of Rocha-Perez in the nude. The police also found a computer that contained downloaded photographs of Rocha-Perez. Detective Corcoran also discovered a camera at the scene, which contained a photo of the victim wearing a silver ring that was found in a bag at the scene.

Detective Corcoran described the suspects' questioning, specifically stating that officers placed Rocha-Perez in a ten by ten room with his hands handcuffed in the front. The room had no windows and three or four chairs and a table. Once Rocha-Perez was removed from the room, Freeman was taken in. Detective Corcoran testified:

> When Ms. Freeman was entering the room, I had actually pulled the table back just a little bit. As she enters in, she crosses the other side of the table and looks down and exclaims. She says, very excitedly, what's that doing here? And I looked down and there was a gold man's wedding band. And I picked it up. And she said, that belongs to Jeffery.

Freeman was released after questioning. Detective Corcoran then sent off a number of items to the Tennessee Bureau of Investigation to be tested.

On cross-examination by Freeman's attorney, Detective Corcoran testified that when he arrived at the scene Freeman was "very upset" and "crying." When he asked if she would accompany him to the precinct to answer questions, Detective Corcoran was concerned enough to offer her a ride. All of the searches were made with Freeman's consent, and she consented to fingerprints, blood tests, and a walk-through of the house. Detective Corcoran stated that no shotgun

shells were ever discovered in their search of the house. They did discover, however, an empty prescription bottle for Freeman filled on April 10, 2005. After outlining the items seized from the home, Detective Corcoran stated that they did not find any trash bags in the victim's vehicle similar to the ones found in the house. Detective Corcoran testified that, when Rocha-Perez was found, he was wearing a tee-shirt that read, "Boom-Boom's Boxing School, Sluggers for Chance Not Chumps. East St. Louis, Missouri."

On cross-examination by Rocha-Perez's attorney, Detective Corcoran testified that the tee-shirt Rocha-Perez was wearing was purchased at Old Navy. He admitted that, although the house and crime scene did not appear to be altered, he did not know for sure. Detective Corcoran viewed the video tape and acknowledged that the tape did not show Rocha-Perez handling the ring later found. He stated that he did not request the victim's fingernails be clipped to check for evidence. In addressing the closet in which Rocha-Perez supposedly lived, Detective Corcoran stated he initially believed that the mattress and closet were staged. He later learned that Rocha-Perez in fact had the "run of the house" for a number of hours each day. Additionally, he stated Rocha-Perez was an illegal alien.

On redirect-examination, Detective Corcoran testified that Freeman was not crying when he first approached her, but she then began crying. She only cried for a "few moments" and was then "very matter of fact." Freeman did not appear to be drugged, and the offer to drive her to the precinct was a "courtesy" because she spoke of a "condition." Freeman appeared to be normal and coherent when Detective Corcoran spoke to her. Clarifying, Detective Corcoran stated that Rocha-Perez was not on camera while the police officers were not in the questioning room; the camera was only turned on when he was with officers.

Agent Donna Nelson, a forensic scientist with the Tennessee Bureau of Investigation, testified that she examined a foam mattress, a shotgun, a blanket, clothing, blood samples and vacuumings. A pair of women's panties indicated the presence of Freeman's DNA. A gray tee-shirt also contained her DNA. A different tee-shirt and ball cap matched Rocha-Perez. A pair of men's underwear contained Rocha-Perez's DNA and the DNA of an unidentified female. On the beach towel discovered at the scene, Agent Nelson discovered Rocha-Perez's sperm and Martha Freeman's DNA; it was possible that sexual intercourse occurred on the towel. A pair of latex gloves had "degraded DNA" insufficient to perform tests. Agent Nelson stated that a number of things could degrade DNA, including washing with plain water, sun exposure, cleaning solution, dirt, incorrect packaging, or dusting for fingerprints.

Based on this evidence, the jury found both Defendants guilty of first-degree murder. Both Defendants were sentenced to life in prison. It is from these judgments that the Defendants now appeal.

## II. Analysis

On appeal, Freeman alleges that the trial court erred in the following ways: (1) by admitting

13

a nude photograph of Rocha-Perez; (2) by refusing to allow Freeman to play a recording of a 911 call; and (3) by refusing to grant her motion to sever. Rocha-Perez alleges the trial court erred by allowing a police officer to testify about a statement Freeman made in violation of the Confrontation Clause. Both Defendants allege there was insufficient evidence to support their convictions. We will address both sufficiency of the evidence claims together and the remaining claims in turn.

## A. Sufficiency of the Evidence

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999); *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *Liakas*, 286 S.W.2d at 859. "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978); *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (citing *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

"'Circumstantial evidence' differs from direct evidence, and consists of proof of collateral facts and circumstances from which the existence of the main fact may be deduced according to reason and common experience of mankind." *Webb v. State*, 203 S.W. 955, 955 (Tenn. 1918); *accord Bishop v. State*, 287 S.W.2d 49, 50 (Tenn. 1956). The Defendants argue, and we agree, that this case was based on circumstantial evidence.

A conviction may be based entirely on circumstantial evidence where the facts are "so clearly interwoven and connected that the finger of guilt is pointed unerringly at the Defendant and the Defendant alone." *State v. Smith*, 868 S.W.2d 561, 569 (Tenn. 1993). Stated differently, "[B]efore an accused may be convicted of a criminal offense based upon circumstantial evidence alone, the facts and circumstances 'must be so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant." *State v. Crawford*, 470 S.W.2d 610, 612 (1971). "A web of guilt must be woven around the defendant from which he cannot escape and from which facts and circumstances the jury could draw no other reasonable inference save the guilt of the defendant beyond a reasonable doubt." *Id.* The jury decides the weight to be given to circumstantial evidence, and "[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (citations omitted).

In the light most favorable to the State, the following evidence was presented: the Defendants began a relationship in 2004. This relationship continued throughout the fall and winter of 2004 after Freeman moved out of the marital home and into an extended stay hotel in Brentwood, where she stayed with Rocha-Perez. On December 29, 2004, the victim spoke with a divorce attorney about his legal rights, but it is unclear if Freeman ever knew about this. Sometime in December 2004, Freeman's friend, Tony Cantrell, moved Rocha-Perez out of the extended stay hotel and into an apartment in Murfreesboro. Cantrell concluded that the relationship between the two had ended. Sometime thereafter, Freeman returned to the marital home. Rocha-Perez and Freeman restarted the relationship, and Rocha-Perez moved into the Freeman house without the victim's knowledge. Rocha-Perez had the "run of the house" while the victim worked long hours at the Freemans' business.

Tony Cantrell began work outside the Freemans' home on the Thursday, April 7. He did not finish because of rain, and he advised the Freemans that he planned to return Monday, April 11, after work, to finish. On Sunday, April 10, at 10:00 p.m., Freeman picked up a prescription for hydrocodone, a pain killer with a side effect of drowsiness. One hour later, at 11:00 p.m., Freeman called the victim's mother to explain to her that the victim would not be calling that night because he was "ill." At 7:45 a.m. on April 11, a neighbor saw Freeman standing on her front porch with a cigarette in hand. Freeman appeared "very still" and "rather unusual." A short time later, at 8:00 or 8:30 a.m., Freeman called Resi-fax to report that the victim would not be at work that day.

At 3:45 p.m., Rocha-Perez was seen running through the neighborhood and into a house under construction. At 4:00 p.m. on April 11, Freeman went to her neighbor's house, and the neighbor called 911. Immediately after she pounded on Beverly's door, Freeman appeared to be "in

shock," "panicky," and "anxious." A short time later, however, Freeman was much calmer, and Beverly recalled that she never cried. The first emergency responders arrived at the scene and described Freeman as "excited," "agitated," "crying," "flailing about with her hands and that sort of thing," and "hysterical." When questioned, Freeman indicated that the incident only occurred twenty to thirty minutes before the emergency responders arrived.

The police, firefighters, and medical personnel discovered the victim's body in the master bathroom. The victim was wet, inside of a sleeping bag, and on his stomach. Medical testimony explained that certain marks on the victim's body indicated that he had been there for some time, at least over eight hours. There were additional marks on the victim's wrists that would have been made while he was still alive and able to struggle against the restraints. There was evidence of four to seven blows to the victim's head. The victim was ultimately killed by strangulation, which would have required "several minutes" of pressure. Virtually no blood was found at the scene except for that under the bag around the victim's head.

The police found evidence of a clean-up also in the house. A number of trash bags were discovered containing a wet pillow case, a wet bath mat, latex gloves, and a phone cord. Additionally, a beach towel was discovered spread out in the living room floor, which contained Rocha-Perez's sperm and Freeman's DNA. There was no evidence of a forced entry to the home.

At 6:30 p.m. on April 11, the police discovered, upon information from witnesses, Rocha-Perez in the attic of a house under construction two streets from the Freemans' home. The officers arrested Rocha-Perez and took him to the police station where they questioned him. Later, in two separate business documents, Freeman signed that the victim died on April 10, 2005.

First degree murder is a premeditated and intentional killing of another. T.C.A. § 39-13-202(a)(1) (2006). The Tennessee Code Annotated defines premeditation:

> 'Premeditation' is an act done after the exercise of reflection and judgment. 'Premeditation' means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion to be capable of premeditation.

T.C.A. § 39-13-202 (d) (2006). Additionally, the Tennessee Supreme Court found the following circumstances sufficient for supporting a finding of premeditation: the use of a deadly weapon on an unarmed victim; the particular cruelty of a killing; the defendant's threats or declarations of intent to kill; the defendant's procurement of a weapon; any preparations to conceal the crime undertaken before the crime is committed; destruction or secretion of evidence of the killing; and a defendant's calmness after a killing. *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997). Furthermore, "evidence of repeated blows is relevant to establish premeditation, although this evidence alone is not sufficient

to establish premeditation." *State v. Sims*, 45 S.W.3d 1, 8 (Tenn. 2001).

In our view, the evidence, while almost entirely circumstantial, supports both convictions for first degree premeditated murder. We first address the "intentional killing" element. The State presented evidence that the victim was tied up while he was still alive, and he struggled against those restraints. The victim was ultimately killed, though, by one or both of the Defendants strangling him either by the hands or a ligature. This would have taken several minutes. This evidence alone is sufficient for a rational jury to conclude beyond a reasonable doubt that the victim was "intentionally killed."

Next, we address whether there was sufficient evidence that each defendant killed the victim. The State presented evidence through the medical examiner that the victim died sometime during the night of April 10, to the morning of April 11. Freeman later stated in business documents that the victim died on April 10, 2005. This indicates that Freeman knew when the victim was killed. The medical examiner testified that the victim was 5'7", weighed 231 lbs., and his hands were tied prior to his death. This would support a theory that the victim was either tied up at gunpoint or that one defendant held the victim down while the other tied his wrists. Additionally, Freeman called the victim's mother at 11:00 p.m. on April 10, 2005, to tell her the victim was "ill" and unable to call that night. This supports an inference that Freeman participated in the killing and attempted to cover it up: Freeman knew that the victim's mother expected him to call at 11:00 p.m. central standard time, and, if he did not, she might get suspicious or worried and contact the police. If the police were notified, their attempts to clean-up the murder would be thwarted. Similarly, Freeman called Resi-Fax the next morning presumably in an attempt to gain more time to dispose of the body and clean up the scene.

Freeman also knew that Tony Cantrell was to return to the house on the afternoon of April 11. A rational jury could conclude that the two Defendants realized they were running out of time to finish the clean-up. The Defendants split up, with Rocha-Perez going his own way and Freeman going to Beverly's house to call the police. Rocha-Perez was subsequently discovered fleeing from the scene of the crime. Finally, there was no evidence of a forced entry. These facts, taken together, support the jury's finding that both Defendants participated in the killing of the victim; we can see no other reasonable hypothesis.

The Defendants both argue that the facts could potentially support a one killer theory: one individual surprises, hits, and knocks the victim unconscious. The individual then ties the victim and strangles him. Taking only the evidence on the victim's body, this scenario might be plausible. However, considering the rest of the evidence, we find this scenario unreasonable. It is highly unlikely that a single killer put the pillowcase on the victim's head before knocking him unconscious if he was not bound first. In our view, the binding must have occurred first, which would have required two people. Additionally, both Defendants' actions after the killing make this unreasonable: the clean-up, the phone calls, Rocha-Perez's flight from the scene, and Freeman's indication that the murder occurred twenty to thirty minutes before the 911 call.

17

Finally, we address whether the Defendants acted with premeditation. One consideration a jury may use in that determination is that the victim was killed with particular cruelty, *see Bland*, 958 S.W.2d at 660: the victim was bound, beaten about the head, and strangled. The marks on the victim's wrist indicate that the victim struggled against his bonds before he was killed. This means that some period of time elapsed after they bound the victim until his ultimate demise. Additionally, a rational jury could have concluded that Freeman was calm after the killing: the victim was killed the night of April 10, and Freeman calmly called the victim's mother to tell her he was "ill." Freeman was seen standing on the front porch holding a cigarette at 7:45 a.m. the following morning, and Freeman called Resi-Fax to advise them the victim would not be at work that day. Multiple witnesses testified that Freeman went through periods of hysteria and calmness.

Additionally, we conclude that the presence of the beach towel at the scene supports a finding of premeditation. As the State argued at trial, and as the jury was free to determine, the presence of the towel on the floor could indicate that the defendants had sex after they killed the victim. This scenario places both Defendants at the scene of the crime and provides circumstantial evidence that the Defendants were behaving calmly after killing the victim, which further supports a finding of premeditation. Finally, the evidence at trial showed that Rocha-Perez and Freeman's relationship was intimate, and a jury could have therefore concluded that they had a motive kill the victim. These facts, taken together, support a finding of premeditation for both Defendants.

Although the Defendants strenuously argue that the web of facts is not so tight so as to not allow another reasonable hypothesis, we disagree. There is sufficient evidence to support the first degree murder convictions for both Freeman and Rocha-Perez. We conclude that a "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). The Defendants are not entitled to relief on this issue.

### B. Photo of Rocha-Perez

Next, Freeman argues that the trial court erred in allowing the State to introduce a photograph of Rocha-Perez found in the Freemans' house. The photo is of Rocha-Perez mostly nude, exhibiting his genitalia. Freeman argues that the photograph is not relevant, and, if relevant, the relevance is not substantially outweighed by the danger of unfair prejudice or confusion of the issues. *See* Tenn. R. Evid. 402, 403.

Under Rule 401, "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Rule 402 states, "All relevant evidence is admissible except as provided by the Constitution of the United States, the Constitution of Tennessee, these rules, or other rules or laws of general application in the courts of Tennessee. Evidence which is not relevant is not admissible." Finally, Rule 403 states, "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair

prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." "The decision regarding the admissibility of photographs pursuant to these Rules lies within the sound discretion of the trial court and will not be overturned on appeal absent a clear showing of an abuse of that discretion." *State v. Young*, 196 S.W.3d 85, 105 (Tenn. 2006) (citing *State v. Banks*, 564 S.W.2d 947, 949 (Tenn.1978)).

First, we conclude that Freeman has not shown the trial court abused its discretion in finding the photograph relevant. At issue was the killing of Freeman's husband, and the existence of an intimate relationship between Freeman and Rocha-Perez provides a motive for that killing. The photograph helps prove the existence of the intimate relationship. Thus, the photograph is relevant under Rule 401 and admissible under Rule 402.

Next, we conclude that Freeman has not shown that the trial court abused its discretion in concluding that the probative value was substantially outweighed by a "danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Freeman argues that the photograph served to inflame the jurors and was cumulative because no one denied the existence of a sexual relationship. After a review of the photograph, we conclude it is marginally inflammatory. We agree with the trial court who stated, "it's not as graphic as you might think it would be." Additionally, a motive for the killing is very important to the case. The additional fact that the photograph was found in the house reinforces this point. We conclude that the trial court committed no abuse of discretion in making the Rule 403 determination, and, as such, Freeman is not entitled to relief on this issue.

## C. 911 Tapes

Freeman next argues that the trial court erred in preventing her from introducing a tape of the 911 call made from Beverly's house. The trial court ruled the tape was hearsay not subject to any exception, and, thus, the trial court excluded the tape. *See* Tenn. R. Evid. 801, 802. Freeman initially challenges the determination that the tape is not subject to any exception, arguing for the application of Rule 803(2): the excited utterance exception. Alternatively, Freeman argues that the trial court's decision prevented her from asserting a defense, in violation of Sixth Amendment to the United States Constitution. We will first address the excited utterance exception, which, as noted above, requires Freeman to show that the trial court committed a clear abuse of discretion. *State v. Young*, 196 S.W.3d 85, 105 (Tenn. 2006)

Generally, out of court statements introduced to prove the truth of the matter asserted are inadmissible as hearsay. Tenn. R. Evid. 801, 802. The excited utterance exception allows hearsay to be admitted when the statement is "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Tenn. R. Evid. 803(2). The Tennessee Supreme Court has quoted the rationale for admitting such statements as follows:

First, since this exception applies to statements where it is likely there was a lack of

19

reflection-and potential fabrication-by a declarant who spontaneously exclaims a statement in response to an exciting event, there is little likelihood, in theory at least, of insincerity. . . . Second, ordinarily the statement is made while the memory of the event is still fresh in the declarant's mind. This means that the out-of-court statement about an event may be more accurate than a much later in-court description of it.

*State v. Gordon*, 952 S.W.2d 817, 819-20 (Tenn. 1997) (quoting Cohen, Paine & Sheppeard, Tennessee Law of Evidence, § 803(2).1 at 532 (3d ed.1995)). Thus, the following requirements are needed: (1) "there must be a startling event or condition;" (2) the statement [must] 'relate to' the startling event or condition;" and (3) "the statement [must] be made while the declarant is under the stress or excitement from the event or condition." *Id*. at 820. "[T]he ultimate test is spontaneity and logical relation to the main event and where an act or declaration springs out of the transaction while the parties are still laboring under the excitement and strain of the circumstances and at a time so near it as to preclude the idea of deliberation and fabrication." *Id*. (quoting *State v. Smith*, 857 S.W.2d 1, 9 (Tenn.), *cert. denied*, 510 U.S. 996 (1993)). We are to consider the time interval between the event and the statement "and the nature and seriousness of the event or condition; the appearance, behavior, outlook, and circumstances of the declarant, including such characteristics as age and physical or mental condition; and the contents of the statement itself, which may indicate the presence or absence of stress." *Id*.

After consideration of these factors, we conclude that Freeman has not shown the trial court abused its discretion. Considering the fact that the victim was killed during the night of April 10, by Freeman's own statement, and Freeman did not make her statement until roughly 4:00 p.m. on April 11, the time interval and the opportunity for fabrication weigh strongly against the sincerity of the statement. Although there is a startling event, and the statement relates to the event, we cannot conclude that Freeman was under the stress or excitement of the event at the time the statement was made. This is merely a self-serving statement made between twelve and twenty hours after the victim was killed. Beverly's testimony of Freeman's behavior and characteristics support our conclusion: although Freeman appeared very exited when she first arrived at the house, she quickly calmed down and never cried. She then returned to a state of hysteria when the authorities arrived, and subsequently calmed down again.

Alternatively, Freeman argues that the statement was necessary for her to present a defense. Exclusions of evidence may violate the Due Process Clause of the Fourteenth Amendment of the United States Constitution even if the exclusions comply with rules of evidence. *State v. Flood*, 219 S.W.3d 307, 316-17 (Tenn. 2007). Principles of due process require that a defendant in a criminal trial have the right to present a defense and to offer testimony. *See Chambers v. Mississippi*, 410 U.S. 284, 294 (1973); *State v. Brown*, 29 S.W.3d 427, 431 (Tenn. 2000). In *Washington v. Texas*, 388 U.S. 14 (1967), the United States Supreme Court stated:

The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may

20

decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law.

388 U.S. at 19.

The right to offer testimony, however, is not absolute: "In the exercise of this right, the accused, as is required of the State, must comply with established rules of procedure and evidence . . . ." *Chambers*, 410 U.S. at 302. Rules of procedure and evidence are designed to assure fairness and reliability in the criminal trial process. *Id.* So long as the rules of procedure and evidence are not applied arbitrarily or disproportionately to defeat the purposes they are designed to serve, these rules do not violate a defendant's right to present a defense. *Flood*, 219 S.W.3d at 317 (citations omitted). Because "state and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials," *Scheffer*, 523 U.S. at 308, "[a]n evidentiary ruling ordinarily does not rise to the level of a constitutional violation," *State v. Rice*, 184 S.W.3d 646, 673 (Tenn. 2006). In determining whether an exclusion of evidence rises to the level of a constitutional violation, we are directed to consider the following: (1) Whether the excluded evidence is critical to the defense; (2) Whether the evidence bears sufficient indicia of reliability; and (3) Whether the interest supporting the exclusion of evidence is sufficiently important. *Flood*, 219 S.W.3d at 317 (citations omitted).

Our first inquiry is whether the excluded evidence is critical to the defense. Freeman wished to introduce a 911 tape on which she stated that, in effect, Rocha-Perez killed her husband. We tend to agree that, in theory, eyewitness testimony to her husband's murder is critical to Freeman's defense. We cannot conclude, however, that the testimony "bears sufficient indicia of reliability." *Id*. In fact, the testimony is a wholly unreliable self-serving statement made by the Defendant many hours after the crime occurred. Similarly, we conclude that the interest supporting the exclusion of the evidence is sufficiently important. That interest is the right of cross-examination. Here, Freeman was merely trying to testify without being subject to cross-examination. The trial court did not err in excluding the testimony. Freeman is not entitled to relief on this issue.

### D. Severance

Freeman next argues that the trial court erred in refusing to sever the Defendants' trials. The Tennessee Rules of Criminal Procedure address the severance of defendant in Rules 8, 13, and 14. A trial court should grant a severance of defendants if:

> (i) before trial, it is deemed necessary to protect a defendant's right to a speedy trial or it is deemed appropriate to promote a fair determination of the guilt or innocence of one or more defendants; or

> (ii) during trial, with consent of the defendant to be severed, it is deemed necessary

to achieve a fair determination of the guilt or innocence of one or more defendants.

Tenn. R. Crim. P. 14(c)(2)(i)-(ii); *accord State v. Howell*, 34 S.W.3d 484, 491 (Tenn. Crim. App. 2000). This decision rests within the sound discretion of the trial court. *Howell*, 34 S.W.3d at 491 (citing *State v. Coleman*, 619 S.W.2d 112 (Tenn. 1981)). "This court cannot interfere with the exercise of the discretion afforded the trial court absent clear abuse." *Id.* (citing *Coleman*, 619 S.W.2d at 116). "The test is whether or not the defendant was clearly prejudiced in his defense by being jointly tried with his co-defendant." *Id.* (citing *State v. Wiseman*, 643 S.W.2d 354 (Tenn. Crim. App. 1982)).

Freeman claims prejudice from the fact that she was prevented from asserting her defense – that Rocha-Perez was the sole killer. *See generally State v. Flood*, 219 S.W.3d 307, 315-16 (Tenn. 2007) (addressing right to present a defense under the Fourteenth Amendment to the United States Constitution). Specifically, the trial court did not allow Freeman to introduce the 911 tape on which she stated that Rocha-Perez killed the victim or a statement of Rocha-Perez stating where he found the victim's ring. Since we have already determined that the 911 tape was properly excluded, Freeman was not "clearly prejudiced" by the trial court's decision not to sever. The tape would not be admissible even if Freeman had been tried separately.

With respect to Rocha-Perez's statement, we similarly conclude that Freeman was not clearly prejudiced. Rocha-Perez was questioned in a police interrogation room. The police removed him from the room, and, as a table was being moved, a man's gold ring was discovered. Freeman entered and identified the ring as the victim's. Rocha-Perez returned to the room and, after questioning on the subject, he admitted he found the ring. The fact that he found the ring was not disclosed to the jury because Rocha-Perez had not yet been Mirandized when he made the statement, and the statement was excluded. Freeman wished to introduce this statement to negate the "inference the State clearly wanted the jury to find [] that Ms. Freeman had given the ring to Mr. Rocha-Perez after the killing of Mr. Freeman as a trophy of some sort." In addressing this issue, the trial court determined that Freeman made no showing that Rocha-Perez would testify to what he stated at the police station if the trials were severed. Additionally, the trial court did not agree that the alleged inference is what the State intended or what the jury actually would infer.

We agree with the trial court, and Freeman has not shown clear abuse. In our view, the alleged inference is very tenuous at best. Additionally, there is no reason to believe that Rocha-Perez would testify at Freeman's trial to what he stated or where he found the ring if the trials were severed. There is no clear prejudice to Freeman because there was a fair determination of her guilt or innocence. *See* Tenn. Crim. P. 14(c). Freeman is not entitled to relief on this issue.

### E. Confrontation

Finally, Rocha-Perez alleges that the trial court erred in allowing Detective Corcoran to testify that Martha Freeman identified the gold ring as the victim's in violation of *Crawford v. Washington*, 541 U.S. 36, 50 (2004), and *Bruton v. United States*, 391 U.S. 123 (1968). Although

not specifically stated as such, Rocha-Perez's argument, in our view, is a complaint about the trial court's decision not to sever the Defendants. *See State v. Ruby Breeden, Billy Nicely, and Marsha Sutton*, No. E2004-01512-CCA-R3-CD, 2005 WL 3199280, at *8 (Tenn. Crim. App., at Knoxville, Nov. 20, 2005) (treating *Bruton* and *Crawford* issues under motion to sever). We review decisions concerning permissive joinder and severance of offenses pursuant to Rules of Criminal Procedure 8(b), 8(c), 14(b), and 14(c) under an abuse of discretion standard. *Spicer v. State*, 12 S.W.3d 438, 442 (citing *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999)).[3]

### 1. *Crawford v. Washington*

In *Crawford v. Washington*, the United States Supreme Court stated that "the principal evil at which the Confrontation Clause was directed was the . . . use of *ex parte* examinations as evidence against the accused." 541 U.S. 36, 50 (2004). To that end, the Court established that testimonial hearsay is inadmissible unless the declarant is unavailable and the defendant had a prior opportunity for cross-examination. *Id*. at 68. In *State v. Maclin*, the Tennessee Supreme Court stated that, "[a]fter *Crawford*, the threshold question in any Confrontation Clause case is whether a challenged statement is testimonial or nontestimonial." 183 S.W.3d 335, 345 (Tenn. 2006). "If it is testimonial, the statement is inadmissible unless (1) the declarant is unavailable and (2) the accused had a prior opportunity to cross-examine the declarant." *Id*. If the statement is not testimonial, then we are free to apply Tennessee's hearsay law to determine the statement's admissibility. *State v. Lewis*, 235 S.W.3d 136, 143 (Tenn. 2007).

Thus, our first objective is determining if Freeman's statement is "testimonial." In *Maclin*, the Tennessee Supreme Court adopted a non-exhaustive list of factors to consider:

> (1) whether the declarant was a victim or an observer; (2) whether contact was initiated by the declarant or by law-enforcement officials; (3) the degree of formality attending the circumstances in which the statement was made; (4) whether the statement was given in response to questioning, whether the questioning was structured, and the scope of such questioning; (5) whether the statement was recorded (either in writing or by electronic means); (6) the declarant's purpose in making the statements; (7) the officer's purpose in speaking with the declarant; and (8) whether an objective declarant under the circumstances would believe that the statements would be used at a trial.

183 S.W.3d at 345. The United States Supreme Court helped to further distinguish between testimonial and nontestimonial statements as follows:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is

---

[3]We note, initially, that the statement was first presented under the exited utterance exception to the hearsay rule. *See* Tenn. R. Evid. 801, 802, 803(2). This issue is not challenged.

to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Davis v. Washington*, 547 U.S. 814, —, 126 S. Ct. 2266, 2273-73 (2006). Pursuant to this guidance, a 911 call made during an attack is not testimonial, *Id*. at 2276-77, but a response to police questioning after an attack is testimonial. *Id*. at 2277-78 (consolidated cases). The differences being as follows: (1) one is a description of a present or ongoing emergency and one is a description of past emergency or occurrence; and (2) one is informal questioning from a 911 operator and the other is formal questioning from an officer. *Id*. at 2276-77.

Based on these descriptions of the difference between testimonial and nontestimonial statements, we conclude that the trial court did not err in allowing Detective Corcoran to testify that Freeman identified the ring as her husband's because the statement was not testimonial. The following factors support the conclusion that the statement was nontestimonial under *Maclin*: (1) the declarant was an observer as opposed to a victim; (2) the contact was originally initiated by Freeman, not the police; (3) although the statement was made in an interrogation room, the interview had not yet begun and thus the situation was not yet formal; (4) the statement was made spontaneously, not a result of any type of questioning; and (5) there is no evidence the statement was recorded. It is unclear what purpose Freeman had in making the statement, and it appears to be a simple spontaneous observation. Finally, factors (7) and (8) weigh in favor of finding the statement testimonial because the officer's original purpose was to obtain information about a homicide and an objective declarant would expect the statement to be used at trial.

Under *Davis*, we conclude Freeman's statement to be more akin to a 911 call than police questioning because Freeman was conveying a present sense observation. Additionally, Freeman's statement was not a response to a question, much less formal questioning by the police; by mere coincidence she saw the ring as she entered the room. Thus, we conclude that the statement was "nontestimonial;" and the rule of *Crawford v. Washington* was not offended.

### 2. *Bruton v. United States*

Under *Bruton v. United States*, the United States Supreme Court ruled that, at a joint trial, it was error to allow into evidence a co-defendant's statement that implicates the defendant without the co-defendant testifying. 391 U.S. at 126; *see Pettyjohn v. Newberry*, 2000 U.S. App. LEXIS 17532 (6th Cir.2000) ("the prohibition applies not only to a non-testifying codefendant's confessions, but also to statements made by the codefendant that implicate the defendant") (citing *United States v. Bartle*, 835 F.2d 646, 651 (6th Cir. 1987)). This would be a violation of the defendant's constitutional rights under the Confrontation Clause of the Sixth Amendment. *Bruton*, 391 U.S. at 126. In analyzing this issue, the trial court determined that "there's no *Bruton* problem because there was no statement about Rocha-Perez made by Ms. Freeman," and the statement did not implicate Rocha-Perez. *See Dorsey v. State*, 568 S.W.2d 639, 642 (Tenn. Crim. App. 1978)

("[T]he rule in *Bruton* does not apply to confessions which do not implicate the non-confessing defendant . . . .") (citing *United States v. Alvarez*, 519 F.2d 1052 (3d Cir. 1975), *cert. denied*, *Hernandez v. United States*, 423 U.S. 914 (1975); *United States v. Gray*, 462 F.2d 164 (5th Cir. 1972), *cert. denied*, 409 U.S. 1009 (1972); *White v. State*, 497 S.W.2d 751 (Tenn. Crim. App. 1973); *Taylor v. State*, 493 S.W.2d 477 (Tenn. Crim. App. 1972); *Maxwell v. State*, 441 S.W.2d 503 (Tenn. Crim. App. 1969); ABA Standards Relating to Joinder and Severance § 2.3(a)(ii) (1967)).

The issue before this Court is whether the statement implicates Rocha-Perez. As the trial court found, the statement on its face does not mention Rocha-Perez. It is merely Freeman's response to the appearance of the victim's ring in the interrogation room. Only when introduced with surrounding facts – Rocha Perez was in the room prior to the finding of the ring; the ring was not in the room before Rocha-Perez arrived – does this statement implicate Rocha-Perez's involvement in the murder of the victim.

In *Richardson v. Marsh*, the United States Supreme Court took up the question of whether statements incriminatory only by "evidentiary linkage" or "contextual implication" violate the Confrontation Clause. 481 U.S. 200, 206 (1987). The facts of *Marsh* are generally these: Martin, Williams and Marsh agreed to commit a robbery; Williams's confession was introduced at his joint trial with Marsh, and the statement explained that Martin picked him up and drove him to the scene; on the way, they discussed the robbery and Martin stated that "he would have to take them out after the robbery." *Id*. at 202-03. The only issue with respect to Marsh was whether she had the specific intend to participate in the killings; thus the statement in the confession was indirect evidence that Marsh was aware of the intent of Martin only later given context when Marsh testified she was in the car on the ride to the scene. *Id*. at 203. Marsh maintained that the radio was too loud for her to hear any conversation between Martin and Williams. *Id*.

The Court stated, "In *Bruton*, the codefendant's confession 'expressly implicat[ed]' the defendant as his accomplice." *Id*. at 208 (citing *Bruton*, 391 U.S. at 124, n. 1). "By contrast, in this case the confession was not incriminating on its face, and became so only when linked with evidence introduced later at trial (the defendant's own testimony)." *Id*. The Court thus ruled that the admission of the confession, accompanied by a limiting instruction, did not constitute error. *Id*. at 211.

In dissent, Justice Stevens argued that the confession was "powerfully incriminating," and "of critical importance because it was the only evidence directly linking respondent with the specific intent, expressed before the robbery, to kill the victims afterwards." *Id*. at 214-15. Further, "If Williams had taken the witness stand and testified, respondent's lawyer could have cross-examined him to challenge his credibility and to establish or suggest that the car radio was playing so loudly that Marsh could not have overheard the conversation between the two men from the back seat." *Id*. at 215-16.

We conclude *Marsh* is instructive in almost every respect. As in *Marsh*, the statement from Freeman only implicates Rocha-Perez with "evidentiary linkage" or "contextual implication" from

Detective Corcoran. Thus, the trial court's ruling on this issue was not in error. We note, however, that the *Marsh* case specifically states that the trial court gave a limiting instruction to the jury that they could only consider Williams's confession against Williams, not Marsh. No such instruction was given in this case. We conclude, though, that the failure to give a limiting instruction was harmless for a number of reasons. First, Rocha-Perez failed to request a limiting instruction. Pursuant to *United States v. Sherlin*, the lack of a limiting instruction when one was not requested is not reversible error in this instance. 67 F.3d 1208, 1216 n.1 (6th Cir. 1995) ("We note that the record in this case does not indicate that the district court gave a limiting instruction to the jury regarding the evidentiary scope of Teague's statement. We do not, however, find the lack of instruction problematic in this case because Sherlin did not request such an instruction. *See United States v. Locklear*, 24 F.3d 641, 646 n. 2 (4th Cir.) (noting that defendant waives right to limiting instruction if he fails to ask for one), *cert. denied*, 513 U.S. 909, 115 S. Ct. 278, 130 L. Ed.2d 195 (1994)"). Second, we find the evidence was not necessary to convict Rocha-Perez as described in the sufficiency of the evidence section above. Finally, we see the right to exclude the evidence in this case as illusory: had Rocha-Perez been successful in obtaining a severance, an objection to the evidence at his trial would have been based on hearsay. The trial court ruled that there was an exception to the hearsay rule, thus the evidence would likely have been admitted against him.

Considering the above cited cases, we conclude Rocha-Perez had not shown that the trial court erred in refusing to grant a motion to sever.

## III. Conclusion

After a thorough review, we conclude that there was sufficient evidence to support the jury's findings, the photograph of Rocha-Perez was not admitted in error, the 911 tape was not precluded in error, the trial court did not err in refusing to sever the Defendants' trials, and the Confrontation Clause was not offended by the introduction of Freeman's statement identifying the victim's ring. As such, we affirm the judgments of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE

26